# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-cv-21215-GAYLES

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and
STATE FARM FIRE & CASUALTY
INSURANCE COMPANY,**
                    **Plaintiffs,**

              **v.**

**FIRST CARE SOLUTION, INC., et al.,**
                    **Defendants.**
_____/

## ORDER

**THIS CAUSE** comes before the Court on a Motion for Summary Judgment [ECF No. 166]

filed by Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and

State Farm Fire & Casualty Insurance Company ("State Farm Fire," and, together with State Farm

Mutual, "State Farm"). In the instant motion, State Farm seeks summary judgment in their favor

against Defendant Noel Ruiz, the only remaining Defendant in this action,[1] on their claims for

unjust enrichment and violations of the Florida Deceptive and Unfair Trade Practices Act

("FDUTPA"), Fla. Stat. § 501.201 *et seq.*,[2] arising from their allegations that Ruiz engaged in a

scheme to circumvent Florida health care clinic licensure laws and, in so doing, obtained hundreds

of thousands of dollars in Personal Injury Protection ("PIP") benefits from them. The Court has

reviewed the parties' briefs, the record in this case, and the applicable law and is otherwise fully

advised in the premises. For the reasons that follow, the Plaintiffs' motion for summary judgment

---

[1]   The Court entered default judgments against Defendants First Care Solution, Inc. [ECF No. 33], and Marcos Padron [ECF No. 17], on April 24, 2015, and May 22, 2015, respectively. The Court entered a consent judgment against Defendant King of Billing and Collection, LLC d/b/a Insurance Resolution Services, Inc., on August 24, 2016 [ECF No. 162]. The Plaintiffs reached a settlement with Defendant Yoryana Balbuena a/k/a Yoryana Hernandez [ECF No. 166 at 1 n.1].

[2]   State Farm asserts that they are no longer pursuing their claim for conspiracy (Count III). *See* Pls.' Mot. at 3 n.3.

shall be granted.

## I.  LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. —, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no ***genuine*** issue of ***material*** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations and internal quotation marks omitted). "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1138 (11th Cir. 2016).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

Where, as here, the ***moving*** party bears the burden of proof at trial:

> that party must show ***affirmatively*** the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (citations, internal quotation marks, and alterations omitted). The nonmovant, in order to avoid summary judgment must

> come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial—that is, such that no reasonable jury could find for the non-movant—should the movant be permitted to prevail without a full trial on the issues.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

\*     \*     \*

Before proceeding further, the Court instructs that it "places great emphasis upon, and implores the parties to be mindful of, the fact that local rules have 'the force of law.'" *State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1158 (S.D. Fla. 2015) (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 191 (2010)). Southern District of Florida Local Rule 56.1 requires that "[a] motion for summary judgment and the opposition thereto shall be accompanied by a statement of material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively," S.D. Fla. L.R. 56.1(a). A statement shall, *inter alia*, "[b]e supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court." *Id.* R. 56.1(a)(2). Furthermore,

a statement of material facts submitted in opposition to a motion for summary judgment "shall correspond with the order and with the paragraph numbering scheme used by the movant." *Id.* R. 56.1(a). Local Rule 56.1(b), which governs the effect of a nonmovant's failure to controvert a movant's statement of undisputed facts, provides: "All material facts set forth in the movant's statement filed and supported as required above ***will be deemed admitted*** unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." *Id.* R. 56.1(b) (emphasis added). This rule "serves a vital purpose in 'help[ing] the court identify and organize the issues in the case.'" *B&A Diagnostic*, 145 F. Supp. 3d at 1158 (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009)). "It also preserves scarce judicial resources by preventing a court from 'having to scour the record and perform time-intensive fact searching.'" *Id.* (quoting *Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1329 (S.D. Fla. 2012)).

Given the purpose that these rules serve, "litigants ignore them at their peril." *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007). The Plaintiffs filed a Statement of Undisputed Material Facts in support of their Motion for Summary Judgment [ECF No. 167], which the Court finds is supported as required and substantially complies with all requirements of Local Rule 56.1. Ruiz filed no response to this Statement in conjunction with the filing of his opposition to the motion for summary judgment. Therefore, pursuant to Local Rule 56.1(b), all facts contained in the Plaintiffs' Statement are hereby deemed admitted.

Because Ruiz "has failed to comply with Local Rule 56.1—the only permissible way for him to establish a genuine issue of material fact at [this] stage—the [C]ourt has before it the functional analog of an unopposed motion for summary judgment." *Mann*, 588 F.3d at 1303; *see also B&A Diagnostic*, 145 F. Supp. 3d at 1158 ("Although a failure to comply with the local rules can often result in harsh, if not fatal, outcomes for a party, such results are 'not by calculated choice of

t[he] Court.'" (quoting *Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1246 (S.D. Fla. 2009))). That said, the Court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed." *United States v. 5800 S.W. 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). "Even in an unopposed motion [for summary judgment], . . . 'the movant is not absolve[d] . . . of the burden of showing that it is entitled to a judgment as a matter of law,'" and the Court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Mann*, 588 F.3d at 1303 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)). To that end, the Court must "consider the merits of the motion" and "review all of the evidentiary materials submitted in support of the motion," *5800 S.W. 74th Ave.*, 363 F.3d at 1101-02, in order to "satisfy itself that the [movant's] burden has been satisfactorily discharged," *Reese*, 527 F.3d at 1268.

## II.    BACKGROUND

With the above standards in mind, the following facts are undisputed and supported by the record before this Court.

Defaulted Defendant First Care Solution, Inc. ("First Care"), was a health care clinic that operated in Miami-Dade County, Florida, from May 15, 2007, through approximately June 2010. Pls.' Statement of Undisputed Material Facts ("Pls.' Statement") ¶ 1. First Care submitted bills to State Farm Mutual and State Farm Fire to recover Personal Injury Protection ("PIP") benefits in connection with the purported treatment of State Farm Mutual's and State Farm Fire's insureds, who were purportedly injured in motor vehicle accidents. *Id.* ¶ 2.

Around May 15, 2007, Ruiz formed First Care. *Id.* ¶ 3. However, to give the appearance that former Defendant Yoryana Balbuena a/k/a Yoryana Hernandez ("Yoryana") owned First Care, Ruiz listed Yoryana as an Officer, Director, and Registered Agent of First Care on its corporate records filed with the State of Florida Division of Corporations. *Id.* At all times, though, Ruiz was

5

the actual owner of First Care. *Id.*

      In May 2005, Yoryana met Ruiz in connection with her attendance at Professional Hands Institute ("PHI"), a massage therapy school Ruiz owns. *Id.* ¶ 4. In addition to attending school at PHI, Yoryana worked at PHI until about December 2006. *Id.* Yoryana obtained her massage therapy license from the Florida Department of Health on October 30, 2006, following her graduation from PHI. *Id.*

      In early 2007, Ruiz, who has never been a licensed health care professional, approached Yoryana and told her that he was going to open a health care clinic but that he needed her to appear as the owner because she had a massage therapy license. *Id.* ¶¶ 5-6. Ruiz told Yoryana he would take care of everything else. *Id.* ¶ 5. Yoryana did not know how to open a health care clinic and had not worked as a massage therapist at the time Ruiz approached her to open the clinic. *Id.* ¶ 7. Her entire involvement in setting up First Care was a single meeting with Ruiz for about twenty minutes to discuss the creation of First Care and her role there. *Id.* ¶ 8. Shortly following that twenty-minute meeting, Yoryana agreed to allow Ruiz to use her name and massage therapy license to list her as the owner of First Care, so that First Care would appear to comply with the then-existing Florida law governing owning a health care clinic.[3] *Id.* ¶ 9. Yoryana never researched the laws governing opening a clinic, and she never contacted a lawyer or accountant in connection with First Care. *Id.* ¶ 8.

      Ruiz submitted an Application for Certificate of Exemption from Licensure to Florida's Agency for Health Care Administration ("AHCA"), representing that Yoryana owned First Care. *Id.* ¶ 10. Based on this representation, AHCA issued First Care a Health Care Clinic Certificate of Exemption effective July 2, 2007. *Id.* ¶ 11.

---

[3]   In 2007, a licensed massage therapist was permitted to own a health care clinic without a license under the Health Care Clinic Act, Fla. Stat. § 400.990 *et seq.* In 2007, the law changed, precluding a licensed massage therapist from owning a health care clinic at which a chiropractor works without obtaining a clinic license. Fla. Stat. § 460.4167 (2008); *see also* Pls.' Statement at 2 n.2.

Yoryana worked at First Care as a massage therapist and was compensated $400 per week. *Id.* ¶ 12. At one point, Yoryana approached Ruiz and asked him to pay her more money; he agreed to increase her wages to $450 per week. *Id.* Yoryana never invested any money in First Care, but Ruiz invested the money to open First Care; pay First Care's administrative fees; and purchase First Care's equipment, furniture, and computers. *Id.* ¶ 13. Yoryana never received profit distributions or payments from First Care other than her weekly salary. *Id.* ¶ 14. Yoryana did not know how First Care obtained patients. *Id.* ¶ 15. She did not choose First Care's office location, as Ruiz selected its location in a building he owned. *Id.* ¶ 16.

Yoryana had no written agreement or other document regarding her purported ownership of First Care. *Id.* ¶ 17. She did not have a key to First Care's office. *Id.* ¶ 18. Ruiz maintained control over First Care's premises, holding all keys and determining First Care's hours of operation. *Id.* Yoryana did not have the authority to hire or fire employees; Ruiz made all of First Care's hiring, firing, and compensation decisions. *Id.* ¶ 19. She did not set policies at First Care, such as types of patients or insurance that First Care would accept. *Id.* ¶ 20. Ruiz implemented and enforced these types of policies. *Id.* Yoryana did not determine the amount to charge for services provided at First Care. *Id.* ¶ 21. She did not pay bills related to First Care's overhead expenses. *Id.* She did not select or have contact with First Care's accountants; rather, Ruiz selected, retained, instructed, and paid First Care's accountants. *Id.* ¶ 22. Ruiz also provided documents for First Care's tax returns and signed those tax returns on behalf of First Care. *Id.* Yoryana did not have any control of First Care's bank account or financial records. *Id.* ¶ 23. Ruiz opened First Care's bank accounts and maintained control over them throughout First Care's existence and after First Care closed. *Id.* Yoryana did not hire lawyers or make litigation decisions for First Care. *Id.* ¶ 24. Ruiz hired First Care's lawyers and made all litigation decisions while First Care was open and after it closed. *Id.*

Yoryana admitted that her sole responsibility at First Care was to provide massage therapy

7

to patients and that she never actually owned the clinic. *Id.* ¶ 25. In December 2007, she told Ruiz she did not want to be listed as the owner any longer because she was only involved at First Care as a massage therapist. *Id.* ¶ 26. Ruiz told her that he would look for a new owner; shortly there-after, Ruiz informed her that Dr. John Romano, a licensed chiropractor, would be the new owner. *Id.* ¶¶ 26, 28. Ruiz and Yoryana never discussed anything further regarding the purported sale of First Care from Yoryana to Romano. *Id.* ¶ 26. Yoryana continued to work at First Care as a massage therapist, during which time she was paid the same amount of money she was previously paid, until February or March 2009, when she returned to working at PHI. *Id.* ¶¶ 27, 32.

In early 2008, defaulted Defendant Marcos Padron introduced Ruiz to Romano. *Id.* ¶ 28. Together, Ruiz, Padron, and Romano orchestrated the purported sale of First Care from Yoryana to Romano. *Id.* ¶ 29. However, Romano paid no money to acquire First Care, made no investment in First Care, and acquired none of First Care's assets at any time. *Id.*

On February 15, 2008, First Care filed an Application for Certificate of Exemption from Licensure as a Health Care Clinic, which represented that Romano was First Care's whole owner. *Id.* ¶ 30. Based on this representation, AHCA issued First Care a Health Care Clinic Certificate of Exemption effective March 11, 2008. *Id.*

Like Yoryana before him, although Romano appeared on paper as First Care's owner, he had no authority as the purported owner of First Care, as Ruiz continued to maintain complete control over the clinic. *Id.* ¶ 31. Romano admitted he managed patient treatment at First Care, but he never controlled First Care's day-to-day operations. *Id.* ¶¶ 44-45. He did not control First Care's bank accounts or financial records, nor did he control who was paid from First Care's accounts. *Id.* ¶ 34. He did not control hiring, firing, or compensation of employees. *Id.* ¶ 35. He did not maintain First Care's patient records. *Id.* ¶ 36. He did not select First Care's insurance provider for First Care's general liability policy and did not obtain First Care's insurance. *Id.* ¶ 37. He did

8

not handle First Care's marketing. *Id.* ¶ 38. He did not oversee First Care's corporate filings with the State of Florida Division of Corporations, nor did he pay the state administrative fees. *Id.* ¶ 39. He did not select, instruct, or pay First Care's accountants. *Id.* ¶ 40. He did not set up or maintain First Care's accounts with utilities or third-party vendors. *Id.* ¶ 41. He did not make the decision to close First Care and was not involved in winding down First Care after it closed. *Id.* ¶ 42.

All decisions made during First Care's existence continued to be made by Ruiz. *See id.* ¶¶ 34-43. Ruiz handled corporate filings and was listed as president/treasurer of First Care on documents submitted to the Florida Department of Revenue. *Id.* ¶ 39. Ruiz unilaterally decided to close First Care and wind it down after it closed. *Id.* ¶ 42. When First Care closed, Romano did not receive any monies or other assets, and did not determine the disposition of those assets. *Id.* ¶ 43. Ruiz handled all such issues. *Id.* After Romano stopped working at First Care, Ruiz paid Peter Henry Locksmith to change First Care's locks. *Id.* ¶ 58.

In addition to the authority outlined above, Ruiz had complete discretion over First Care's bank accounts from the time First Care was founded until well after it closed, making numerous cash withdrawals and writing checks to himself, his wife Juana Perez, other family members, entities Ruiz and/or his family owned and controlled, and third parties. *Id.* ¶ 46. Ruiz signed more than 84% of all checks drawn on First Care's bank accounts (totaling $1,058,695), while Romano signed only 4.6% (totaling $58,007) and Yoryana signed only 2.7% (totaling $33,856). The remaining 8.7% of the checks, which total $109,344, contain an illegible signature—possibly Ruiz's. *Id.* ¶ 47.

From January 2008 through January 2015, Ruiz, his family members, and entities associated with them received a total of $419,874.61 from First Care's bank accounts:

- Ruiz received $161,195 through checks he wrote to himself and cash withdrawals he made;

- Ruiz's wife received $22,550;

- Ruiz and his wife received $68,500 via checks made payable to them jointly;

- Best Transportation, Inc., a company owned by Ruiz and his wife, received $104,489.61. Ruiz signed every check payable to Best Transportation;

- Marr Building Associates, another entity in which Ruiz had an ownership interest, received $11,700 through checks signed by Ruiz;

- PHI received $2,040 through checks signed by Ruiz;

- Nocari Investments, another entity in which Ruiz had an ownership interest, received $900 through a check signed by Ruiz;

- Pedro Ruiz, Ruiz's uncle, received $14,000;

- Felicia Ruiz and Ulises Ruiz, two of Ruiz's relatives, received $16,500 and $1,500, respectively;

- Niebla Billing Services Corp. and Niebla Transportation Services, Inc.—entities owned by Ruiz's nephew Leonel Garrido—received $16,500; and

- Padron received $2,850.

*Id.* ¶¶ 48(a)–(j). By contrast, Romano and his entities—CDF Management Company, Golden Panda Management Corporation, and Green Eco-Safe Management Solutions, Inc.—received a combined total of $59,738, and Yoryana received $44,456.78. *Id.* ¶¶ 48(k)–(*l*). Padron received $2,850. *Id.* ¶ 48(m).

Of that over $419,000 that was paid to Ruiz, his family members, and associated entities, $139,989.61 was paid during the four years ***after*** Ruiz closed First Care. *Id.* ¶ 50. At least one withdrawal slip from First Care's account, evidencing Ruiz's cash withdrawal from that account, specifically references Ruiz as First Care's "owner." *Id.* ¶ 51. Ruiz used First Care's check card to pay his personal attorney who represented him in a foreclosure proceeding against residential property Ruiz owned. *Id.* ¶ 52. Ruiz wrote checks against First Care's bank accounts to pay the Traffic Ticket Office for citations that he, Padron, Yoryana, and one of Ruiz's relatives received. *Id.* ¶ 53. In total, Ruiz wrote at least forty-four checks on First Care's bank accounts to the Traffic Ticket Office for ticket citations. *Id.* ¶ 54.

When Ruiz closed First Care, he, along with his wife and children, moved the furniture

and records to a storage unit that Ruiz selected and rented. *Id.* ¶ 55. While winding down First Care, Ruiz disposed of and sold First Care's remaining equipment and withdrew the money from First Care's bank accounts. *Id.* ¶ 56. Around this time, Ruiz instructed Yoryana to close First Care's bank account at Bank of America. *Id.* ¶ 57. Because Yoryana's name was also on the account, she went with Ruiz to the bank and obtained a check made out to Yoryana for $29,426.78. *Id.* At Ruiz's direction, Yoryana cashed the check and gave the cash to Ruiz "because it was his." *Id.* Ruiz handled all other aspects of the winding down, including satisfying lease obligations, shutting down utilities, and closing third-party accounts. *Id.* ¶ 61.

State Farm Mutual and State Farm Fire received bills from First Care for treatment that First Care purportedly provided to State Farm Mutual's and State Farm Fire's insureds from approximately December 2007 through April 2010. *Id.* ¶ 63. State Farm collectively paid First Care $640,665.06. *Id.* State Farm relied on First Care's alleged compliance with Florida law when it paid First Care's claims, and State Farm did not know that First Care was operating without the requisite license and without properly qualifying for a licensure exemption. *Id.* ¶ 64.

## III.   DISCUSSION

### A.   *The Treatment Rendered at First Care Was Unlawful*

The legal framework governing State Farm's motion has been aptly described in two decisions by Chief Judge Moore. First:

> Florida's Motor Vehicle No-Fault Law ("Florida's No-Fault Law") requires that Florida automobile insurance policy holders have PIP coverage to provide victims of motor vehicle accidents benefits for reasonable, necessary, related and lawful treatment, without regard to fault. Fla. Stat. §§ 627.730–627.7405. The law sets forth what benefits are covered under PIP, stating in pertinent part that "the medical benefits shall provide reimbursement only for such services and care that are lawfully provided, supervised, ordered or prescribed." Fla. Stat. § 627.736(1)(a). "An insurer is not required to pay a claim or charges for any service or treatment that was not lawful at the time rendered." Fla. Stat. § 627.736(5)(b)(1)(b). . . .
>
> The statutory definition of "'lawful' or 'lawfully' means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of

> state and federal law related to the provision of medical services or treatment." Fla. Stat. § 627.732(11). Florida's No-Fault Law also provides that "[n]o statement of medical services may include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services." Fla. Stat. § 627.736(5)(d). Insurers are not required to pay a claim or charges "[w]ith respect to a bill or statement that does not substantially meet the applicable requirements of [section 627.736(5)(d)]." Fla. Stat. § 627.736(5)(b)(1)(d).

*B&A Diagnostics, Inc.*, 145 F. Supp. 3d at 1163. And further:

> Florida's Health Care Clinic Act ("HCCA"), Fla. Stat. §§ 400.990 *et seq.*, requires that all health care clinics be licensed by the AHCA unless they qualify for an exemption. Fla. Stat. § 400.991. The express purpose of the HCCA "is to provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by [the AHCA]." Fla. Stat. § 400.990(2). The HCCA also incorporates the licensure requirements of the Health Care Licensing Procedures Act, Fla. Stat. §§ 408.801 *et seq.*, which recognizes that "[u]n-licensed activity constitutes harm that materially affects the health, safety, and welfare of clients." Fla. Stat. § 408.812(2). Accordingly, "it is unlawful to provide services that require licensure . . . without first obtaining . . . a license." Fla. Stat. § 408.804. The HCCA mandates that "all charges or reimbursement claims made by or on behalf of a clinic that is required to be licensed under this part, but that is not so licensed . . . are unlawful charges, and therefore are noncompensable and unenforceable." Fla. Stat. § 400.9935(3).
>
> The HCCA allows for certain exemptions from mandatory licensure. One such exemption provides . . . :
>
>> the licensure requirements of [the HCCA] do not apply to[.] . . [a] corporation that provides health care services by licensed health care practitioners . . . which is ***wholly owned*** by one or more licensed health care practitioners . . . so long as one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws.
>
> [Fla. Stat. § 400.9905(4)(g)].

*State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1350 (S.D. Fla. 2015) (emphasis added).

Here, First Care obtained exemptions from mandatory clinic licensure from the AHCA in 2007 and 2008 by representing that Yoryana and Romano, respectively, owned First Care. State Farm maintains that these representations were false, and therefore, the clinics unlawfully obtained

payments from State Farm throughout this period. State Farm also maintains that there is no genu-
ine issue of material fact that First Care did not qualify for any applicable exemptions from the
mandatory licensure requirement, as they were never wholly owned by Yoryana or Romano. *See
id.* at 1350-51.

The Court agrees. The Court has considered the relevant factors in determining ownership
of a business entity, and finds that the admitted facts and the record establish that Yoryana and
Romano (1) never owned stock in First Care or exercised corporate powers over First Care;
(2) never invested any capital in First Care; (3) never had any right to profit from First Care or
risked any loss; (4) never had the power to sell First Care or cause it to cease operations; and
(5) never participated in the management or control of First Care's business operations. *See id.*
1351 (citing *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 585 (11th
Cir. 2013)). Furthermore, neither Yoryana nor Romano (1) had any keys to the facility in which
First Care was housed; (2) owned any equipment located within First Care; (3) had authority to
retain counsel or hire accountants; (4) were responsible for income taxes; (5) were responsible for
payment of vendor bills, including utilities; (6) were involved in the day-to-day operational activi-
ties of First Care; (7) determined the amounts billed to insurers; (8) were involved in First Care's
marketing; (9) controlled First Care's payroll; (9) controlled or were involved in employment
decisions; (10) maintained patient records; (11) dictated office policies pertaining to pricing or
advertising; or (12) dictated decisions as to office personnel or hours of operation. *See id.* (citing
*Allstate Ins. Co. v. Schleub*, 19 Fla. L. Weekly Supp. 561b (Fla. 9th Cir. Nov. 10, 2011)). The
admitted facts do demonstrate, however, that Ruiz *was* the true owner of First Care; he clearly
satisfies each of the above-listed factors that both Yoryana and Romano failed to satisfy. In sum,
State Farm has established that there can be no genuine issue of material fact that First Care was
not wholly owned by a licensed health care practitioner, as required for the HCCA's mandatory

13

clinic licensure requirements, because Yoryana and Romano were both used by Ruiz as "straw [men] in order to circumvent" those requirements. *Id.*

A clinic that does not qualify for the "wholly owned" exemption, and does not otherwise have a license, operates unlawfully under Florida law. *Silver Star*, 739 F.3d at 582, 585. Because First Care did not qualify for this exemption, and because it did not otherwise have a license during its operation, State Farm has also established that Ruiz unlawfully operated First Care and any treatment rendered there was likewise unlawful.

**B.**     ***State Farm Is Entitled to Summary Judgment on Their Claims***

"Because claims by a clinic operating in violation of the [HCCA] are deemed noncompensable and unenforceable under the statute, an insurer can recover its payments made to a violator-clinic . . . ." *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1330 (11th Cir. 2016). Having determined that First Care was unlawfully operated, the Court makes quick work of its analysis of State Farm's claims.

**1.     Unjust Enrichment**

"[T]o establish the elements of a cause of action for unjust enrichment, State Farm must show that: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof." *Medical Service Center of Florida*, 103 F. Supp. 3d at 1355.

The admitted facts show that State Farm conferred a benefit of Ruiz by providing PIP payments to First Care, and that Ruiz voluntarily accepted and retained those payments, despite knowing that he was operating First Care in violation of the HCCA's exemption requirements and that he was, thus, unlawfully providing treatment to patients. The Court also finds "that it would be unjust under these circumstances to allow [Ruiz] to retain these benefits despite [his]

unlawful conduct." *Id.* Therefore, State Farm's motion for summary judgment on their unjust enrichment claim is granted.

### 2.    FDUTPA

To establish a claim under the FDUTPA, State Farm must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Galstaldi v. Sunvest Communities USA, LLC*, 637 F. Supp. 2d 1045, 1056 (S.D. Fla. 2009). A deceptive act or practice is "one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Washington v. La Salle Bank Nat'l Ass'n*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011). Fraudulent conduct in the context of billing for PIP benefits qualifies as a deceptive act for purposes of FDUTPA. *See State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 F. App'x 714, 723 (11th Cir. 2011) (per curiam), *rev'd in part on other grounds sub nom. State Farm Mut. Auto. Ins. Co. v. Williams*, 563 F. App'x 665 (11th Cir. 2014) (per curiam); *see also State Farm Mut. Auto. Ins. Co. v. Comprehensive Physician Servs., Inc.*, No. 14-2381, 2014 WL 7070832, at *3 (M.D. Fla. 2014); *State Farm Mut. Auto. Ins. Co. v. Physicians Grp. of Sarasota, L.L.C.*, 9 F. Supp. 3d 1303, 1312-13 (M.D. Fla. 2014); *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-80051, 2011 WL 4389915, at *12 (S.D. Fla. 2011).

*Medical Service Center of Florida*, 103 F. Supp. 3d at 1354 (citations altered). State Farm has established, based on the admitted facts, that there is no genuine issue of material fact that Ruiz violated FDUTPA. The Court finds that Ruiz "engaged in unfair and deceptive acts and practices in the conduct of [his] trade and commerce by unlawfully operating [a] medical clinic[]" to obtain payments for PIP benefits that State Farm had a statutory right to deny as unlawfully rendered. *Id.* Additionally, the Court finds that "[t]hese deceptive acts and practices resulted in harm to Plaintiffs, Plaintiffs' insureds, and the public as a whole." *Id.* at 1354-55 (citation and footnote omitted). Accordingly, State Farm's motion for summary judgment on their FDUTPA claim is granted.[4]

\*    \*    \*

In the event the Court granted summary judgment in State Farm's favor, State Farm seeks

---

[4]   The Court finds Ruiz's argument pertaining to his purported "affirmative defense of 'assumption of business risk'" to be without merit as it is not supported by the record.

an award of attorney's fees, costs, and expenses. FDUTPA provides, "In any civil litigation resulting from an act or practice involving a violation of this part . . . the prevailing party, after judgment in the trial court and exhaustion of all appeals, if any, may receive his or her reasonable attorney's fees and costs from the nonprevailing party." Fla. Stat. § 501.2105. The Court reserves judgment on this request. State Farm may file an appropriate motion for attorney's fees and costs within sixty days of the entry of judgment.

IV.     CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that the Plaintiffs' Motion for Summary Judgment [ECF No. 166] is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 58, final judgment will be entered separately.

This action is **CLOSED** and all other pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 26th day of January, 2017.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE